UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROY L. WALKER,

    Petitioner,

vs.

L.E. SCRIBNER, Warden,

    Respondent.

_____/

No. C 07-4199 PJH (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254.  The court ordered respondent to show cause why the writ should not be granted.  Respondent has filed an answer and a memorandum of points and authorities in support of it, and has lodged exhibits with the court.  Petitioner has responded with a traverse.  For the reasons set out below, the petition is denied.

## BACKGROUND

The California Court of Appeal summarized the facts of the case as follows:

> The murder victim, Barry Bell, a notorious neighborhood drug dealer, was shot and killed in the backyard of the residence at 3231 Chestnut Street in Oakland on the morning of September 24, 1999. Charlene Santana, who lived nearby at 3239 Adeline Street, heard the sound of "several bursts of gunfire" from very close to her house while lying in her bed at about 9:00 a.m. Her "heart started racing" and she immediately "grabbed the phone and dialed 911" to report the shooting. As she was on the telephone Santana looked out her window across the street to see "two young males" walking very rapidly out of an alleyway used by "people coming through from Chestnut." Santana did not recognize the two men, but described their appearance: they both had knit caps pulled down low around their heads; they wore dark puffy jackets and dark baggy pants; and one of the men "had on red shoes."
>
> After Santana concluded her conversation with the 911 operator, she went downstairs and looked out the front door. The two men were already gone from sight, so she returned upstairs to wait for the police. When the police appeared across the street, Santana contacted them to reveal that she was the one who "called 911."

1    Oakland Police Officer Holmgren responded to Santana's report of gunshots. He observed "two male blacks on the northeast corner of 34th Street and Adeline who fit the description" given by Santana, particularly the "red shoes" worn by one of the men. Officer Holmgren attempted to contact the two men, but they "split up," so he parked his patrol vehicle on the corner and followed the man wearing the red shoes, whom he identified at trial as defendant. After defendant briefly entered a market, he "came right out again" onto Adeline Street. Officer Holmgren instructed defendant to "come here" to "talk to him." Defendant did not respond as the officer directed. When the officer "called to him again," defendant "began running in a southeasterly direction." Officer Holmgren chased after defendant for half a block, and quickly caught him as he attempted to scale a fence between two houses.

Defendant was handcuffed and the area was searched. A plastic bag that Officer Holmgren had seen defendant discard as he climbed the fence was found to contain crack cocaine. Cash in the amount of $77 and an unexpended .38-caliber "special GBL" bullet were discovered on the other side of the fence. A firearm was not found in defendant's possession or in the area of the pursuit. A gunshot residue test on defendant was performed at the scene, but no results were obtained.

Santana was then taken to the scene of defendant's detention on Adeline Street to determine if she recognized him as "one of the people" she had seen walking out of the alley near her house right after the gunshots were fired. Officer Holmgren had defendant stand outside the patrol vehicle for a field identification. Defendant was "positively identified" by Santana from his clothing, which she testified "looked exactly like what [she] saw earlier."

Sergeant Olivas of the Oakland Police Department, the lead homicide investigator in the case, arrived at the scene of the shooting just after 10:00 a.m. He observed the victim Bell "lying in the grass" near a doghouse next to the rear fence of the residence. He had already been pronounced dead. Bell was killed by a .40-caliber bullet that entered his lower back. The trajectory of the bullet indicated that it struck the victim as he was bent or curled over rather than standing or lying flat on the ground. He also suffered a gunshot wound to his left arm.

Olivas was informed by other officers at the scene that defendant was in custody, and another person by the name of Shawnell Mayers was also a suspect in the shooting. Olivas directed other officers to transport defendant to the homicide section of the police department and place him in an interview room.

Sergeant Olivas and his partner began interviewing defendant at 7:02 that evening. Defendant "appeared nervous," but agreed to speak with the officers after receiving his Miranda admonitions.[1] Defendant told the officers that he previously had altercations with the victim. Bell sold crack cocaine on Chestnut Street between 32nd and 34th, as did defendant, but they did not have any conflict over drug sales. After one of defendant's friends Mickey was shot and killed, however, he began "asking questions to find out who did it." Bell complained to defendant that he was "telling everybody [Bell] shot" Mickey. Defendant replied, "Man, I ain't saying nothing to nobody." Defendant bought a gun "[o]ff the streets" when someone later told him "they was gonna do you like how they did Mickey." Defendant denied that Bell ever personally threatened him, however.

---

[1]The interview was recorded and played for the jury at trial.

2

Defendant stated to the officers that the afternoon before the shooting he was sitting on the hood of a car in front of the house at 3240 Chestnut, where he was temporarily "staying." One of the victim's "partners" approached defendant and said, "Keep it real." He repeated, "Man, keep it real," and seemed "like he wanted to fight," so defendant went into the house, got his clothes, and left. Defendant then retrieved his gun, a black revolver, from under a tire at the back of an abandoned house. Six live bullets were in the gun.

About 8:00 that evening defendant's friend and partner Shawnell (Shay) Mayers met him on Chestnut Street. Defendant thought he "was gonna do" Bell himself that night, but the victim did not appear. Defendant felt that "somethin' was gonna happen" to either him or Bell. He and Mayers did not discuss shooting Bell, however. They both slept that night in an abandoned house at 34th and Chestnut Streets owned by a friend named Lisa.

The next morning defendant and Mayers awoke around 9:00. Although they "never discussed it," they were both very angry and "already knew what [they] wanted to do." Mayers said "he's ready," and they left the house.

They walked down Adeline Street and stopped behind the fence of the back yard at 3231 Chestnut Street where they knew Bell hid "his bundle" of cocaine. Defendant kept his gun in his pants pocket as they waited for Bell; Mayers also had a gun. After about 10 minutes, Bell appeared in the back yard. When defendant moved, Bell heard him and said, "Niggers trying to steal my bundle." Defendant stated that he immediately raised his gun over the fence and "opened fire" at Bell. Mayers began shooting at Bell just after defendant. Defendant stated that he shot five times as the victim fell to the ground and attempted to hide behind a dog house.

After they stopped shooting, defendant and Mayers walked back onto Adeline Street and returned to the house where they slept the night before. Defendant extracted the five spent shells from his gun and threw them over a fence. He kept the one remaining live round in his pocket. He then gave his gun to Mayers.[2]

Defendant left the house, followed by Mayers. He was headed for a store at Adeline and 32nd Street, when he saw the police and "went into a store on 34th." When he left the store the police "said they needed to talk to" him. Defendant "just took off running," with the officers in pursuit. Defendant also stated that as he ran he threw a bundle of crack cocaine over a fence before he was apprehended by the officers.

A further search of the scene of the shooting in the back yard at 3231 Chestnut Street by an evidence technician uncovered two .40-caliber shell casings, and three expended slugs of a caliber he did not determine. One of the slugs was found in the doghouse; another bullet passed through the side of the doghouse and lodged in the dirt. No narcotics were found in the yard.

According to expert testimony, the live bullet discarded by defendant as he ran from the police was a .38 special cartridge with a "semi-jacketed hollow point design," as was a "fired bullet" found in back yard at 3231 Chestnut Street. Three other casings retrieved from the scene of the shooting were .38 special brass cartridges that were

---

[2] Defendant did not know what Mayers did with the gun, and it was not found.

3

all fired from the same .38 special or .357 Magnum revolver.[3] The expended .40 Smith and Wesson casings found at the scene were all fired from the same weapon. The criminalist further testified that the bullet that killed the victim was also a .40 Smith and Wesson or ten millimeter auto caliber full metal jacketed bullet, fired from a semi-automatic pistol.

In his testimony at trial defendant offered a different version of the shooting than he previously gave the officers in his statement. He explained that he had been acquainted with Bell since he was a young teenager. Bell was "well known" in the "Chestnut-Adeline area" of West Oakland for "selling dope." Defendant sold drugs for Bell on Chestnut Street for a while when he was 16 years old, then began selling drugs for a man known as "E." By the summer of 1999, defendant started working for himself as a "street level" drug seller. Defendant and his partner Mayers bought their drugs from Bell and others. He lived at "Janice's house" at 3240 Chestnut Street, but the house was financed and controlled by Bell.

Defendant knew Bell had a reputation as a "violent" man, as did Mayers. Mayers and defendant had an amicable relationship with Bell until Mayers and Bell engaged in a consensual boxing match, in which Bell "got whooped." Thereafter, Bell's "whole attitude changed" toward defendant and Mayers, and over time animosity developed. On one occasion, Mayers unsuccessfully tried to shoot some of Bell's dealers.

Defendant thought Bell was responsible for shooting his friend Mickey in the face in late 1997 or early 1998. Then, in September of 1999, Bell shot Mayers's "little brother" Rodney and another friend of defendant named Randy. After the shooting, Bell called defendant at Janice's house to complain to him, "why you go around town telling everybody I shot Randy and Rodney." Defendant said, "I ain't going around telling nobody nothing," but Bell warned him, "you keep talking, you be next." Defendant felt threatened by Bell's telephone call.

On September 23, 1999, another one of defendant's partners almost hit one of Bell's cars. An argument between Bell and Mayers ensued before everyone dispersed. Defendant returned to Janice's house, where Bell's partners warned him to "keep it real," and "started talking mess" to him. Defendant feared that his life was in danger, so he contacted his partners. Mayers proposed that they "knock ... out" Bell, but defendant said, "We got enough problems as it is." Defendant advised Mayers that he "didn't want anything to do" with a fight or "gunplay" with Bell.

Defendant decided to leave Janice's house. He got his .357 magnum revolver for "protection," and took his clothes to his father's house. Later that day, defendant and Mayers saw some of Bell's associates in a Suburban "mugging" them. Defendant visited his girlfriend briefly, then joined Mayers at the abandoned house at 34th and Chestnut. Defendant told Mayers that in the morning he was going to his father's house and try to leave Oakland.

On the morning of September 24th, defendant and Mayers left the abandoned house to go to the nearby backyard where defendant kept his "bundle." Defendant had his gun in his right pants pocket; Mayers was armed with a .40-caliber semi-automatic pistol. When they reached the back yard at 3231 Chestnut Street defendant heard someone behind a fence say, "You niggers trying to steal my bundle," then

---

[3] .38-caliber bullets are capable of being fired from either a .38-caliber special firearm or a .357 Magnum.

4

immediately "started hearing shots" from behind him. Defendant ducked down and fired one shot in the air in the "general direction where [he] heard the shots coming from." Defendant testified that he shot, "Because I thought somebody was shooting at me." He turned around and realized that Mayers was the one "who was shooting" while leaning over the fence. He then looked through the fence to see Bell "flat on his face" on the ground, not moving.

Defendant "froze up" as Mayers emptied his gun into the back yard. Mayers then took defendant's gun, climbed back onto the fence, and fired more shots at Bell. Mayers began to run, and called to defendant to "come on." They walked out of the alley onto Adeline Street and proceeded back to the abandoned house, where Mayers emptied the remaining shells from the guns. Defendant threw the casings under some stairs, although he retained one of the unexpended bullets. They walked back onto Adeline and 34th, where they saw a police car. Defendant "started running," but was caught on a fence by Officer Holmgren.

Defendant testified that he "made a whole lot of stuff up" in his statement to the police and exaggerated his role in the shooting of Bell to incriminate his friend Mayers "as little as possible." Mayers was shot and killed in Richmond two days after the shooting of Bell, so in defendant's testimony at trial he no longer needed to protect Mayers.

Ex. 5 at 2-7.

Petitioner was convicted by a jury in Alameda County Superior Court of one count of first degree murder with the special circumstance of lying-in-wait, and one count of possession of cocaine base for sale; the jury also found true a sentence enhancement for the use of a firearm. Resp. Ex. 1B at 328, 532-533. Petitioner was sentenced to life without parole for the murder conviction. Petitioner also was sentenced to a consecutive term of 20 years for the firearm use enhancement and a concurrent term of four years for the possession for sale conviction. *Id.* at 555. On September 29, 2005, the California Court of Appeal affirmed his sentence and conviction. Resp. Ex. 5. On December 14, 2005, the California Supreme Court denied petition for review. Resp. Ex. 6. On August 10, 2007, petitioner filed the instant habeas petition.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322 at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir. 2000).

## DISCUSSION

As grounds for habeas relief petitioner claims that: (1) the trial court violated his right to present a defense and to the effective assistance of counsel by issuing a supplemental

6

jury instruction during jury deliberations; (2) the trial court violated his right to due process and to present a defense by refusing his requested instructions on self-defense and imperfect self-defense; and (3) he received ineffective assistance of appellate counsel, in violation of his right to due process.

**I.    Supplemental Jury Instruction**

Petitioner claims that the trial court erred by giving an additional instruction during jury deliberations regarding liability as an aider and abettor for the special circumstance of lying-in-wait. Petitioner maintains that this instruction presented a "new" theory of liability to the jury, and because closing argument had already ended, counsel did not have an opportunity to argue about the instruction to the jury. As a consequence, petitioner argues, he was deprived of his constitutional rights to present a defense and to receive effective assistance of counsel.

The California Court of Appeal summarized the relevant circumstances as follows:

> In the instructions given before deliberations began, the court advised the jury: "To find that the special circumstance referred to in these instructions as murder while lying in wait is true, each of the following facts must be proved. One, the defendant Roy Walker, himself, and no other person, intentionally killed the victim. And two, the murder was committed while the defendant was lying in wait." On the second day of deliberations, the jury asked for clarification of the lying in wait instruction, and specifically if the defendant must "be the only person shooting/must the lethal bullet have been lodged from his gun?" Over defense counsel's objection, the court repeated the lying in wait instruction, with an additional paragraph that stated: "For the purposes of this instruction, if you find the defendant was not the actual killer, the special circumstance may nevertheless be found if you find beyond a reasonable doubt that the defendant with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted another in commission of murder in the first degree."

Resp. Ex. 5 at 8.

The Due Process Clause "requires that criminal prosecutions 'comport with prevailing notions of fundamental fairness' and that 'criminal defendants be afforded a meaningful opportunity to present a complete defense.'" *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). Moreover, the right to present a closing argument is "a basic element of the adversary fact-finding process in a criminal trial." *Herring v. New York*, 422 U.S. 853, 858 (1975). A trial court's refusal to

7

1 allow defense counsel to present a closing argument constitutes a violation of the
2 defendant's Sixth Amendment right to the effective assistance of counsel.  *See Conde v.*
3 *Henry*, 198 F.3d 734, 739 (9th Cir. 2000).  However, "[a] supplemental instruction which
4 merely clarifies an existing theory does not mandate additional arguments."  *United States*
5 *v. Fontenot*, 14 F.3d 1364, 1368 (9th Cir. 1994).

6   The California Court of Appeal noted that the trial judge had, prior to closing
7 arguments, instructed the jury on aiding and abetting in relation to the murder charge, and
8 thus defense counsel addressed aiding and abetting during his closing argument.  Resp.
9 Ex. 5 at 13-14.  Therefore, the appellate court found that petitioner "was not substantially
10 misled in formulating or presenting closing argument, or unfairly prevented from imparting
11 his defense to the jury," and as a result, "[n]o prejudicial error occurred."  Resp. Ex. 5 at 14.

12   Petitioner is incorrect that the supplemental instruction presented a "new" theory of
13 liability to the jury because, as noted by the California Court of Appeal, petitioner's counsel
14 was told prior to closing argument that the jury would be instructed on aiding and abetting
15 liability for purposes of the murder charge.  As a result, petitioner's counsel knew to
16 address this theory of liability during closing argument, which he did as follows:

> What the aider and abettor instruction tells you is that mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting.  Mere knowledge that a crime has been committed and the failure to prevent it does not amount to aiding and abetting.  The mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.

Resp. Ex. 2C at 469.

  The supplemental instruction indicated that aiding and abetting applied to the lying-in-wait special circumstance, as well as the murder charge.  As such, it did not present a different or new theory of liability, however, but merely a clarified the charges to which the aiding and abetting theory applied.   As noted above, a "supplemental instruction which merely clarifies an existing theory does not mandate additional arguments."  *Fontenot*, 14 F.3d at 1368.  Defense counsel's closing argument about aiding and abetting liability for the murder charge applies equally to aiding and abetting liability for the special circumstance of

8

lying-in-wait. The supplemental instruction, given as an answer to a jury question during deliberation, only clarified for the jury whether aiding and abetting liability was applicable to the special circumstance of lying-in-wait in addition to the murder charge. As such, it did not present a new theory of liability, as petitioner contends, and did not require the trial court to allow additional argument by defense counsel.[4]

Petitioner also claims that he received ineffective assistance of counsel because his lawyer failed to argue for reopening of arguments after the supplemental instruction. Petitioner's counsel objected to the supplemental aiding and abetting instruction, but did not request to reopen argument to address the new instruction. Resp. Ex. 2C at 525. Because this court finds that petitioner's counsel adequately addressed aiding and abetting during closing argument, Resp. Ex. 2C at 469, and that additional arguments following the instruction was not required, counsel's failure to request additional argument was neither deficient nor prejudicial under *Strickland v. Washington*, 466 U.S. 668, 700 (1984).

As the trial court did not violate petitioner's rights to present a defense or to receive effective assistance of counsel, the state courts' rejection of this claim was neither contrary to nor an unreasonable application of federal law. Petitioner is not entitled to relief on this claim.

**II.     Refusal of Self-Defense Instructions**

Petitioner claims that by refusing to give self-defense instructions to the jury, the trial court violated his right to due process and to present a defense. "Due process requires that criminal prosecutions 'comport with prevailing notions of fundamental fairness' and that 'criminal defendants be afforded a meaningful opportunity to present a complete defense.'" *Clark*, 450 F.3d at 904 (quoting *Trombetta*, 467 U.S. at 485). "A defendant is entitled to an instruction on his theory of the case if the theory is legally cognizable and there is evidence

---

[4] Petitioner and the Court of Appeal both cite *United States v. Gaskins*, 849 F.2d 454 (9th Cir. 1988). *Gaskins* presented some similar circumstances to the present case, but it only addressed Rule 30 of the Federal Rules of Criminal Procedure and explicitly stated that it did "not reach the question whether" Gaskin's constitutional rights were violated. *Id.* at 455. As the Federal Rules of Criminal Procedure do not apply to petitioner's conviction in state court, *Gaskins* is not applicable to petitioner's case.

upon which the jury could rationally find for the defendant." *United States v. Morton*, 999 F.2d 435, 437 (9th Cir.1993). This is so, "even if the evidence is weak, insufficient, inconsistent, or of doubtful credibility." *United States v. Washington*, 819 F.2d 221, 225 (9th Cir.1987). A defendant needs to show only that "there is evidence upon which the jury could rationally sustain the defense." *United States v. Jackson*, 726 F.2d 1466, 1468 (9th Cir.1984) (per curiam). On the other hand, a trial court may preclude a defense theory where "the evidence, as described in the defendant's offer of proof, is insufficient as a matter of law to support the proffered defense." *United States v. Dorrell*, 758 F.2d 427, 430 (9th Cir.1985).

      The California Court of Appeal held that "a trial judge must only give those instructions which are supported by substantial evidence." Resp. Ex. 5 at 15 (quoting *People v. Ponce*, 44 Cal.App.4th 1380, 1386 (1996)). The appellate court explained that under California law, "'[i]mminence is a critical component' of a theory of self-defense," and found that petitioner had not presented any evidence that he had a reasonable, or unreasonable, fear of *imminent* physical harm. Resp. Ex. 5 at 16 (quoting *People v. Humphrey*, 13 Cal.4th 1073, 1094 (1996)). Applying the "substantial evidence" standard, the appellate court concluded that the trial court did not err in refusing to give self-defense instructions. *Id.*

      The applicable federal standard for when a trial court must give an instruction on a defense theory, i.e. when there is "evidence upon which the jury could rationally find for the defendant," *Morton*, 999 F.2d at 437, is more rigorous than the "substantial evidence" standard applied by the California Court of Appeal. Because the state court applied a less stringent standard than the applicable federal standard, the state court's decision is "contrary to" federal law within the meaning of 28 U.S.C. § 2254(d)(1). *Williams (Terry)*, 529 U.S. at 412-13 (finding that state court's decision is "contrary to" federal law within the meaning of § 2254(d)(1) where state court decision differs "on a question of law" from clearly established federal law). This does not end our inquiry, however. "Having determined that the Court of Appeal 'failed to apply' clearly established Supreme Court law,

10

[citation], [this court must then] then [proceed] to address the question 'whether [the Court of Appeal's] decision constituted error and if so whether the error had a substantial or injurious effect on the verdict.'" *Early v. Packer*, 537 U.S. 3, 10 (2002) (quoting and reversing *Packer v. Hill*, 291 F.3d 569, 579 (9th Cir. 2002)).

A review of the record indicates that the trial court did not err because the evidence could not rationally support a theory of self-defense. To establish a successful claim of reasonable or unreasonable self-defense, "[t]here must be evidence the defendant feared imminent, not just future, harm." *People v. Minifie*, 13 Cal.4th 1055, 1068 (1996). Petitioner's evidence at trial did not suggest a fear of "imminent . . . harm." *Id.* at 1068. First, petitioner testified that he initially heard shots coming from behind him, which was the opposite direction from the victim whom he was facing. Resp. Ex. 2B (Reporter's Transcript ("RT")) at 299. Second, a fence separated petitioner from the victim at all times, which, according to petitioner's testimony at trial, prevented petitioner from even seeing the victim. RT at 302. Third, petitioner did not claim that the victim made any threats of immediate physical harm. The only statement petitioner attributed to the victim was "You niggers trying to steal my bundle." RT at 300. In the instant petition, petitioner admits that the victim's "specific comment about someone trying to 'steal his bundle' was not literally a threat and that [petitioner] was not physically assaulted by [the victim] before the shooting began." Pet. Ex. A at 22. In light of this evidence, the jury could not rationally find that petitioner was in fear of "imminent" harm, as is required by California law to establish either perfect or imperfect self-defense. As the evidence did not warrant the self-defense instructions, the trial court did not violate his constitutional right to present a defense by failing to give such instructions. Accordingly, petitioner is not entitled to habeas relief on this claim.

### III.   Ineffective Assistance of Appellate Counsel

Petitioner contends that his appellate counsel was ineffective for failing to argue on appeal that the lack of self-defense instructions violated his right to present a defense.

The Due Process Clause of the Fourteenth Amendment guarantees a criminal

11

defendant the effective assistance of counsel on his first appeal as of right. *See Evitts v. Lucey*, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in *Strickland*, 466 U.S. 668. *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989); *United States v. Birtle*, 792 F.2d 846, 847 (9th Cir. 1986). A defendant therefore must show that counsel's advice fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. *Miller*, 882 F.2d at 1434 & n.9 (citing *Strickland*, 466 U.S. at 688, 694; *Birtle*, 792 F.2d at 849).

Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant. *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. *See id.* at 1434. Appellate counsel therefore will frequently remain above an objective standard of competence and have caused his client no prejudice for the same reason--because he declined to raise a weak issue. *Id.* This court has already determined that petitioner's right to present a defense were not violated by the trial judge's refusal to give an instructions on self-defense. As the claim lacked merit, his appellate counsel's failure to raise it on appeal was neither deficient nor prejudicial under the *Strickland* standard. Consequently, petitioner did not receive ineffective assistance of counsel on appeal, and he is not entitled to habeas relief on this claim.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**. The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: April 29, 2009

PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.07\WALKER199.RUL.wpd